# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **CLIFFS SALES COMPANY,** ) | **CASE NO. 1:07 CV 485** |
| ) | **1:07 CV 1466** |
| Plaintiff, ) | |
| ) | |
| v. ) | **JUDGE DONALD C. NUGENT** |
| ) | |
| **AMERICAN STEAMSHIP COMPANY,** ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| ) | **MEMORANDUM OPINION** |
| **AMERICAN STEAMSHIP COMPANY,** ) | **AND ORDER** |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| **NORTHSHORE MINING COMPANY,** ) | |
| **CLIFFS SALES COMPANY, and** ) | |
| **OGLEBAY NORTON MARINE** ) | |
| **SERVICES COMPANY, LLC** ) | |
| ) | |
| Defendants. ) | |

This matter is before the Court on the Motions of American Steamship Company ("American Steamship") for Partial Summary Judgment against Cliffs Sales Company ("Cliffs") on Cliffs' Complaint in Case No. 07 CV 485 (ECF #56) and on Cliffs' Counterclaims in Case No. 07 CV 1466 (ECF #32). As the claims in Cliffs' Complaint in Case No. 07 CV 485 and in its Counterclaims in Case No. 07 CV 1466 are virtually identical, both motions will be addressed simultaneously by the Court. Also pending before the Court is the Motion by Cliffs for Partial Summary Judgment Regarding Fuel Adjustments against American Steamship and Oglebay Norton Marine Services Company ("Oglebay")(This motion has been filed in both actions.

(ECF #33 and #57)). Finally, Oglebay has filed a Motion for Partial Summary Judgment on Count 1 of the Cross-Claims alleged against it by Cliffs in Case No. 07 CV 1466. (ECF #35). For the reasons that follow, all of the motions are denied.

## PROCEDURAL AND FACTUAL HISTORY

Cliffs filed the first complaint in this saga, Case No. 07 CV 485, against American Steamship on February 21, 2007. In that complaint, Cliffs asserts that American Steamship has breached its transportation and invoicing agreements with Cliffs. The first contract at issue is the Vessel Transportation Agreement ("VTA"), which was entered on May 1, 2002, by Northshore Mining Company and Northshore Sales Company doing business as Cliffs and Oglebay. Pursuant to the VTA, Oglebay agreed to transport iron ore pellets for Cliffs from various locations on the Great Lakes termed the "origin ports" to the Mittal Ore Dock[1] in Cleveland. (Complaint, ¶8). Under the VTA the iron ore pellets would be shipped utilizing a fleet of self-unloader vessels (the "USA vessels") operated by United Shipping Alliance, LLC ("USA"). USA was a limited liability company created by a Pooling Agreement between Oglebay and American Steamship dated January 3, 2002. (Complaint, ¶9).

Under the Pooling Agreement, American Steamship and Oglebay each used its vessels to perform a portion of the transportation required under the VTA and invoiced Cliffs for charges in connection with such transportation. (Complaint, ¶10). Pursuant to Section 4(a) of the VTA, Cliffs was charged a set fee per gross ton for transportation of the iron ore pellets from the Origin Ports to the Mittal Ore Dock. (Complaint, ¶11). While some vessels could transport iron

---

[1] At the time that the VTA was entered, the Mittal Ore Dock was known as the ISG Cleveland, Inc.dock. Mittal Steel purchased ISG Cleveland and so the Court will refer to the dock as the Mittal Steel Dock.

2

ore pellets non-stop from the Origin Ports to the Mittal Ore Dock without unloading, other vessels transporting iron ore pellets from the Origin Ports were unable to navigate the six miles along the Cuyahoga River between the Cleveland Bulk Terminal ("CBT"), a transshipping facility located at the mouth of the Cuyahoga River to the Mittal Ore Dock. Thus, these vessels would have to unload all or a portion of their cargo at CBT. If unloading is necessary at CBT, the iron ore pellets are stored at the CBT until they can be reloaded onto another vessel and shuttled to the Mittal Ore Dock. (Complaint, ¶¶13-14). Since a degradation of quality of the iron ore pellets occurs when they are unloaded at the CBT dock, the VTA requires the shipper to "use its best efforts" to maximize direct deliveries from the Origin Ports to the Mittal Ore Dock. (Complaint, ¶19). Cliffs alleges that the VTA estimates delivery of "a minimum of approximately 1,2500,000 tons annually directly to the Mittal Ore Dock without utilizing CBT as a transshipping facility." (Complaint, ¶20).

The VTA quoted rates for the movement of iron ore pellets from (a) each Origin Port to the Mittal Ore Dock ("a complete movement rate"), (b) each Origin Port to CBT (an "Origin/CBT Rate") and (c) CBT to the Mittal Ore Dock (the "Shuttle Rate"). (Complaint, ¶16) Cliffs asserts that the VTA provides that the Shuttle Rate is applicable only if vessels other than USA's vessels are utilized from the Origin port to CBT. Id.

The VTA also provided for fuel adjustments. Where a USA vessel was used for shipments from an Origin Port to the Mittal Ore Dock, the shipments were subject to a fuel adjustment of one cent ($.01) per gross ton (the "Origin Ports Fuel Adjustment"). Where USA vessels were used to complete the transportation of iron ore pellets from CBT to the Mittal Ore Dock after delivery of the pellets to the CBT by vessels other than USA vessels, a fuel

3

adjustment of one-half cent ($.005) per gross ton was imposed (the "CBT Fuel Adjustment"). (Complaint, ¶17). Cliffs asserts that under the VTA, Cliffs could only be charged the CBT Fuel Adjustment when USA vessels were shuttling pellets from CBT to the Mittal Ore Dock that were originally delivered to CBT by non-USA vessels. Thus, the maximum fuel adjustment which could be charged under the VTA was one cent. (Complaint, ¶18).

Cliffs alleges that American Steamship and Cliffs had an "Agreement" that for any transportation by American vessels under the VTA that American Steamship would invoice Cliffs only for charges permitted by the VTA. (Complaint, ¶22).

At the close of the 2005 shipping season, Oglebay and American Steamship dissolved USA and Oglebay transferred six of its vessels to American Steamship and exited the Great Lakes shipping business. Oglebay assigned its rights and obligations under the VTA to American Steamship and American Steamship assumed the obligations and agreed to fulfill all transportation requirements contained in the VTA. (Complaint, ¶¶23-25).

Cliffs alleges that contrary to the provisions of the Agreement and the VTA, American Steamship invoiced Cliffs both the Origin Ports Fuel Adjustment and the CBT Fuel Adjustment each time an American Steamship vessel transported iron ore pellets from the Origin Ports to CBT and thereafter shuttled the same pellets from CBT to the Mittal Ore Dock. Before the assignment of the VTA to American, Cliffs paid the fuel adjustment fees as invoiced by American Steamship, unaware that it was being overcharged. After the assignment of the VTA, Cliffs paid the entire amount invoiced by American Steamship under protest because American Steamship had no right to charge both fuel adjustment fees. (Complaint, ¶26-29).

Cliffs also alleges that American Steamship did not use its best efforts to maximize direct

4

deliveries from the Origin Ports to the Mittal Ore Dock. (Complaint, ¶30).

Based on these factual allegations, Cliffs asserts four causes of action against American Steamship. Count 1 asserts that American Steamship breached the VTA and the Agreement by overcharging Cliffs both the Origin Ports Fuel Adjustment and the CBT Fuel Adjustment each time an American Steamship vessel transported iron ore pellets from an Origin Port to CBT and thereafter shuttled the same pellets from CBT to the Mittal Ore Dock. American Steamship also breached the VTA by failing to use its best efforts to maximize direct deliveries from the Origin Ports to the Mittal Ore Dock. Finally, American Steamship breached (or anticipatorily breached) the VTA by refusing to make winter ore shuttles from CBT to the Mittal Ore Dock beginning on March 12, 2007, unless Cliffs agrees to pay additional charges not permitted under the VTA and past practices of the parties. (Complaint, ¶¶33-40).

Count II asserts a claim for unjust enrichment based upon the alleged overcharges for fuel adjustments set forth in Count 1. (Complaint, ¶¶41-44).

Count III seeks declaratory judgment regarding the overcharges.

Count IV seeks declaratory judgment regarding the winter ore shuttle of iron ore pellets from CBT to the Mittal Ore Dock.

In response to Cliffs' Complaint, American Steamship asserted four counterclaims against Cliffs. (ECF #34). The first counterclaim seeks a declaration that Cliffs has been and is still required to pay a surcharge of $.005 for every $.010 increase in set fuel costs per gross ton of iron ore pellets shipped from the CBT to the Mittal Ore Dock. (Counterclaims, ¶¶11-15). The second counterclaim seeks a declaration that American Steamship is not obligated to provide winter ore shuttles at no additional charge. (Counterclaims, ¶¶16-20). The third counterclaim

seeks a declaration that by objecting to the $.005 fuel surcharge and threatening not to pay it, Cliffs has anticipatorily breached the VTA. (Counterclaims, ¶¶21-24). The fourth counterclaim seeks a declaration of the parties' rights and obligations under the VTA and all other agreements that purportedly govern the parties' shipping arrangement.

Three months after Cliffs filed its Complaint in Case No. 07 CV 485, American Steamship essentially re-filed the same lawsuit, this time asserting its counterclaims as claims against Cliffs and adding new defendants Northshore Mining Company[2] and Oglebay. (See Complaint in Case No. 07 CV 1466, ECF #2.) Count One of the Complaint seeks a declaration that the VTA permits the collection of a fuel surcharge of $.005 for each $.010 increase in set fuel costs per gross ton of iron ore pellets shipped from the CBT to the Mittal Ore Dock, therefore Cliffs is required to pay the $.005 fuel surcharge for every $.010 increase in set fuel costs per gross ton of iron ore pellets shipped from the CBT to the Mittal Ore Dock. (ECF #2, ¶¶19-21).

Count Two seeks a declaration that neither the VTA or any other agreement between the parties requires Oglebay or American Steamship to provide winter ore shuttles at no additional charge. (ECF #2,¶¶24-26).

Count Three seeks a declaration that Cliffs has anticipatorily breached the VTA by stating that it will not continue to pay the $.005 fuel surcharge for each $.010 increase in fuel costs per gross ton of iron ore pellets transported between CBT and the Mittal Ore Dock. (ECF #2,¶¶28-30).

---

[2] Northshore Mining Company and Northshore Sales Company apparently do business as Cliffs. See Complaint in )7 CV485, ¶8. Accordingly, the Court will treat any reference to Northshore Mining as a reference to Cliffs.

Finally, Count Four seeks a general declaration of the parties' rights and obligations under the VTA and all other agreements that govern the parties' shipping arrangement. (ECF #2, ¶¶33-34).

In response Cliffs asserted four counterclaims against American Steamship and four cross-claims against Oglebay. These counterclaims and cross-claims mirror its complaint in Case No. 07 CV 485 except that Oglebay has been added as a cross-claim defendant.

The Motions currently pending before the Court overlap. American Steamship has sought partial summary judgment on Cliffs' Complaint in 07 CV 485 and on its counterclaims in 07 CV 1466. Oglebay seeks partial summary judgment on Cliffs' cross-claims against it in 07 CV 1466. Cliffs seeks partial summary judgment against American Steamship and Oglebay on its claims regarding fuel adjustments under the VTA. The Court will address the motions in order.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

8

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

**I. The Motions of American Steamship and Oglebay**

The motions of American Steamship and Oglebay for partial summary judgment on Cliffs' claims overlap. American Steamship moves for summary judgment on Cliffs' breach of contract claim and some of the declaratory judgment claims. Specifically, American Steamship seeks judgment on Cliffs' claim that it breached the VTA by failing to use best efforts to maximize direct deliveries to the Mittal Ore Dock (Count One) and that it breached an "invoicing agreement" by overcharging Cliffs for certain fuel charges (Counts One and Three)[3] and that it breached an obligation to transport ore to the Mittal Ore Dock during the winter months at no charge.(Counts One and Four).

Oglebay moves for summary judgment on Cliffs' claim that Oglebay breached the VTA by failing to use best efforts to maximize direct deliveries to the Mittal Ore Dock and on any claim that Oglebay breached any invoicing agreement that is not expressly set forth in the VTA. These motions will be addressed by issues.

---

[3] The Parties have informed the Court that Cliffs' claim based upon an "invoicing agreement" with American Steamship has been withdrawn. Accordingly, the Court will not address that claim in the motions.

9

**A. Breach of the "Best efforts" clause of the VTA**

Section 6 of the VTA provides that:

> [Oglebay] will use its best efforts to maximize direct deliveries to the [Mittal Ore Dock]. It is estimated that [Ogelbay] will deliver a minimum of approximately 1,250,000 tons annually directly to the [Mittal Ore Dock] without utilizing CBT as a transshipping facility.

(VTA §6, Ex. C to ECF #36 in 07cv1466). Cliffs argues that Section 6 sets out two distinct obligations for American Steamship and Oglebay: 1) to use best efforts to maximize direct deliveries to the Mittal Ore Dock, and 2) to deliver a minimum of approximately 1,250,000 tons annually to the Mittal Ore Dock. Cliffs points to the testimony of Don Gallagher, who negotiated the VTA on behalf of Cliffs, in support of this interpretation. Cliffs further opines that because the 1.25 million gross ton "minimum" could not be satisfied exactly, the insertion of the word "approximately" means "within one boatload." Thus, Cliffs contends that in order to meet this contractual requirement, American Steamship and Oglebay had to directly deliver "within one boatload" of 1.25 million gross tons annually to the Mittal Ore Dock.

Oglebay and American Steamship object to this interpretation of Section 6. Section 6 does not, they contend, create a minimum requirement for direct deliveries. Rather, Section 6 requires Oglebay and American Steamship to provide their best efforts to directly deliver approximately 1.25 million tons of iron ore to the Mittal Ore Dock. The second sentence of Section 6 estimates a goal for the best efforts required in the first sentence. Thus, falling below 1.25 million tons of direct deliveries is not a breach of contract if Oglebay and American Steamship used their best efforts under the circumstances.

Based upon the plain language of Section 6 read in its entirety, the clause requires

Oglebay and American Steamship to use their best efforts to maximize direct delivery of iron ore pellets to the Mittal Ore Dock. Best efforts is further defined by the goal of shipping approximately 1.25 million tons per year directly to the Mittal Ore Dock. Thus, failure to ship 1.25 million tons of iron ore pellets directly to the Mittal Ore Dock in any given year would not be an automatic breach of Section 6. Rather, that failure would be part of the equation to determine if American Steamship and Oglebay had used their best efforts to maximize direct delivery to the Mittal Ore Dock in that year.

The term "best efforts," while common in commercial contracts, is not easily defined and is dependent on the facts in each situation. See *Baron Fin. Corp. v. Natanzon*, 509 F.Supp.2d 501, 515-17 (D. Md. 2007)("[A] 'best efforts' assessment will similarly be heavily dependent on the particular facts and circumstances of the case in question. . . .[C]ompliance with the 'best efforts' provision appears to be a question for the jury in the upcoming trial."). In this case both sides point to facts which should be considered in a best efforts analysis–the kind of vessel assigned for each load, tonnage commitments, size of docks, accessibility of the dock to vessels, weather, wind direction, speed, water depth, maintenance needs of the vessels and directions of the end user. Cliffs also contends that when Oglebay exited the shipping business and terminated the pooling agreement the capacity to perform direct deliveries to the Mittal Ore Dock was cut from seven river vessels to four and that this voluntary reduction of direct shipping ability breached their best effort obligations. In any event, it seems clear that Cliffs has adduced evidence in support of its claim that Oglebay and American Steamship have failed to use best efforts to maximize direct deliveries as required by Section 6 of the VTA. Accordingly, the motions of American Steamship and Oglebay for summary judgment on this issue are denied.

### B. Breach of the Winter Ore Shuttle Obligation

American Steamship seeks summary judgment on Cliffs' claim that American Steamship breached the VTA by refusing to make winter ore shuttles from the CBT to the Mittal Ore Dock beginning on March 12, 2007, unless Cliffs agrees to pay additional charges not permitted under the VTA and past practices of the parties. (Complaint, Count I, Counterclaims at ¶34) American Steamship also seeks summary judgment on Cliffs' request for a declaration that "under the terms of the VTA, [American Steamship] is obligated to perform the Winter Ore Shuttle at no additional charge." (Complaint, Count IV, Counterclaims at ¶52)

The winter ore shuttle dispute concerns an alleged obligation to provide shipments of ore from the CBT to the Mittal Ore Dock outside of the "Shipping Season," defined in the VTA as "the period each year from and including March 25 through and including January 15 of each subsequent time period." (VTA § 1(d)).  There seems to be no dispute that Oglebay and/or American Steamship conducted winter ore shuttles in 2003, 2004, 2005, 2006 and 2007.  The dispute is over whether those shuttles were required by and performed under the VTA. American Steamship and Oglebay contend that the winter ore shuttles were never part of the VTA and were performed under a separate agreement, not the VTA as an accommodation to Cliffs.

It is Cliffs' position that the VTA and the understanding of the parties demonstrates that the winter shuttling of iron ore pellets was not a gratuitous accommodation but a contractual obligation owed to Cliffs arising from the VTA.  Cliffs notes that the 15 year VTA tracked Cliffs' 15 year iron ore requirements contract with Mittal, and that the purpose and the intent of

the VTA is to enable Cliffs to fulfill those requirements, called Float requirements.  Cliffs obtains its iron ore pellets to fulfill the Float requirements from its mines near the four origin ports in the upper Great Lakes.  Because three of the four origin ports are north of the Soo Locks, which open and close on March 25 and January 15, respectively, the VTA requires Cliffs to furnish the Float requirements while the Soo Locks are open, that is during the "shipping season" defined by the VTA.

Cliffs further argues that the parties knew and intended that there would be shuttles during the winter between CBT and the Mittal Ore Dock because of the limited storage available on the Mittal Ore Dock.  In order for Mittal to continue steelmaking during the winter, the parties expected to and agreed to perform winter shuttles of iron ore pellets from the CBT storage facility.

While American Steamship does not refute that the parties knew that the Mittal Ore Dock could not store a sufficient quantity of iron ore pellets to allow Mittal to continue operations during the winter and that iron ore pellets would need to be stored at the CBT, thus necessitating winter ore shuttles between CBT and the Mittal Ore Dock, its argument is that the VTA did not provide for the winter shuttles.  There is no express provision for winter ore shuttles in the VTA.  As such, American Steamship contends that as a matter of contract construction, the Court should not interpret the terms of an agreement when the language of the agreement is clear.  See *Alexander v. Kandell*, No. H-90-2, 1990 WL 187232, 1990 Ohio App. LEXIS 5195, at *4-5 (Ohio Ct. App. 1990).  Similarly, American Steamship asserts that the Court should not look outside the four corners of the contract to determine the meaning of the contract or look to the course of performance of the contract to interpret or define terms of the contract.

13

Based upon the specific facts of this case, the long length of the VTA and the surrounding circumstances that gave rise the contract and its terms**,** the Court will not find that the VTA is unambiguous on its face, precluding any examination of the intent and knowledge of the parties or the course of conduct of the parties since the inception of the VTA.  Rather, the question of whether winter ore shuttles were covered by the VTA, and more specifically, whether American Steamship was obligated to perform them at no additional cost, is best developed at trial**.**  Accordingly, summary judgment on this issue will not be granted at this time.  As the Court has found genuine issues of material fact with respect to each of the claims on which American Steamship and Oglebay seek partial summary judgment, those motions are denied.

## II. Cliffs Motion for Partial Summary Judgment on the Fuel Adjustments

Cliffs moves for partial summary judgment on its claim that it is a breach of the VTA for American Steamship and Oglebay to charge a 1/2 cent per ton fuel adjustment on shuttles of iron ore pellets from CBT to the Mittal Ore Dock when such iron ore pellets were delivered to CBT by a United Shipping Alliance ("USA") vessel.  Cliffs contends that it is only when such iron ore pellets were delivered to CBT by a vessel other than a USA vessel that American Steamship or Oglebay can charge a .05 cent fuel adjustment for shuttles from CBT to the Mittal Ore Dock.

As noted above, USA began providing shipping services to Cliffs pursuant to the VTA in 2002.  The VTA lists Base Rates and Adjustments for seven different ore movements.  (See VTA § 4)  There were three specified base rates for deliveries from each origin port to the Mittal Ore Dock.[4] There were also three specified base rates for deliveries from the origin ports to CBT.

---

[4] Since two origin ports were close to each other, the same rate applied to those

Finally, there was a specified base rate for the shuttle movement from CBT to the Mittal Ore Dock.  There is an asterisk next to the base rate for the shuttle between CBT and the Mittal Ore Dock.  The asterisk denotes the following: "Rate is applicable only if vessels other than USA's vessels are utilized from origin port to CBT."

As the VTA is a fifteen year contract, it provides for the rates to be adjusted annually. (See VTA § 4(b))  The VTA also has a section providing for fuel rate adjustments, either up or down. (VTA § 4(c)).  This provision establishes a range of fuel prices and then authorizes a fuel adjustment up or down for each one cent increase or decrease outside of the established range.

> The Adjusted Separate Base Rates are subject to a fuel adjustment, either up or down, one cent ($.01) [one-half cent ($.005) for cargoes loaded at CBT] per gross ton for each one cent ($.01) increase or decrease outside of the applicable fuel oil price bracket
> . . ..

(VTA § 4(c)(i)).  American Steamship and Oglebay contend that § 4(c)(i) permits them to charge the 1/2 cent fuel adjustment on all cargoes loaded at CBT, regardless of whose vessel brought the cargo to CBT from the origin ports.  There are no limitations on the scope of the 1/2 cent adjustment in § 4(c)(i) as there is in § 4(a).  Moreover, American Steamship and Oglebay contend that there is no indication that the .01 cent and .005 cent adjustments are intended to be exclusive as Cliffs contends.  American Steamship and Oglebay assert that the language and punctuation in the phrase "[one-half cent ($.005) for cargoes loaded at CBT]" suggests that it is understood that the .01 cent and 1/2 cent could be aggregated "when brackets are used in the context of expressing a mathematical computation, the brackets indicate aggregation." (ECF #40

---

ports–Sliver Bay and Superior.  Thus, while there were four origin ports, there were only three rates for those ports.

15

at p.8).

Cliffs asserts that $.01 and $.005 fuel adjustments cannot be aggregated because there is no Adjusted Separate Base Rate for a shuttle movement of cargo originally brought to CBT by a USA vessel in § 4(a) to be subject to a fuel adjustment under § 4(c)(i). The only shuttle rate which is an "Adjusted Separate Base Rate" subject to fuel adjustment is the shuttle rate from CBT to Mittal Ore Dock where non-USA vessels made the deliveries to CBT. As a matter of contract interpretation, Cliffs contends that a contract should be read to give effect to all its provisions and to render them consistent with each other. *See Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995). Cliffs interpretation gives meaning to both Sections 4(a) and 4(c)(i). American Steamship and Oglebay's interpretation ignores the first phrase of § 4(c)(i) which provides that "the Adjusted Separate Base Rates are subject to a fuel adjustment..." Once the bracketed language is placed in full context, Cliffs argues, it becomes clear that the bracketed language setting forth the 1/2 cent fuel adjustment for cargoes loaded at CBT is intended to replace (not add to) the full one cent fuel adjustment for the other six Adjusted Separate Base Rates for cargos transported from the origin ports to CBT or the Mittal Ore Dock.

American Steamship and Oglebay argue that Cliffs' payment of the fuel adjustment invoices from 2002 to 2006 without objection demonstrates that it accepted the interpretation that American Steamship and Oglebay could assess the 1/2 cent fuel adjustment on all tonnage loaded at CBT regardless of whether a non-USA vessel delivered the tonnage to CBT from the Origin ports. Cliffs' claims it made those payments by mistake and after they discovered the invoicing error in 2006, it made all further payments subject to objection with a reservation of rights.

16

American Steamship and Oglebay scoff at Cliffs' contention that the invoices between 2002 and 2006 were paid by mistake because Cliff's did not realize they were being overcharged.  Each side points to evidence supporting their contention.  Cliffs' with deposition testimony of American Steamship and Oglebay employees agreeing that the 1/2 cent fuel adjustment for the shuttle could not be charged in addition to the one cent fuel adjustment on the long haul trips and Oglebay with copies of invoices and supplemental invoices that they argue show that Cliffs must have known they were being charged fuel adjustments on all of the tonnage loaded at CBT.  At a minimum, American Steamship and Oglebay contend that this creates a genuine issue of material fact that precludes entry of summary judgment.  Cliffs counters that even if the Court considers its payment history, the anti-waiver provision of the VTA makes clear that any payments made during the performance of the contract do not prejudice each party's right to seek payments, adjustments, and settlements, even after the VTA's termination in 2017.  (VTA § 17).

As all parties concede, the VTA is a 15 year contract with provisions for changes in rates and other variables over the course of the contract.  While all of the parties claim that the VTA is unambiguous, nevertheless they all have different interpretations of its critical provisions. The circumstances surrounding the inception of the VTA, industry practice and the intention of the signatories will be fully developed at trial.  Accordingly, summary judgment on the fuel rate adjustments, or any other provision of the VTA, is inappropriate at this time.

## CONCLUSION

For the reasons set forth herein, the Motions for Partial Summary are Denied.  (In Case No. 07 CV 485, see ECF #56 and #57) (In Case No. 07 CV 1466 see ECF #32, #33 and #35).

Trial will proceed as scheduled on May 13, 2008 at 8:30 a.m.

       IT IS SO ORDERED.

                                                 */s/ Donald C. Nugent*
                                                 Donald C. Nugent
                                                 UNITED STATES DISTRICT JUDGE

DATED:  May 5, 2008